08 CRIM 849

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA :

- v. - : **INFORMATION**

PETER CINQUEGRANI, : 08 Cr. (CM)

Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ___________
DATE FILED: SEP 11 2008

Judge McMahon

**COUNT ONE**

**(Conspiracy)**

The United States Attorney charges:

1. At all times relevant to this Information, Ernst & Young ("E&Y") was one of the largest accounting firms in the world. E&Y provided tax services to corporate and individual clients, including some of the wealthiest individuals in the United States. The business unit responsible for providing tax advice and financial planning advice to individuals was known as Personal Financial Counseling, or "PFC."

2. E&Y also had a department within its tax practice known as the National Tax Department ("National Tax"). The individuals assigned to National Tax provided expert tax advice to E&Y professionals in the field. Within National Tax was a sub-group of individuals whose particular areas of expertise related to E&Y's PFC practice.

**E&Y's VIPER/SISG Group**

3. In or about early 1998, E&Y formed a group within National Tax that was devoted to designing, marketing and implementing high-fee tax strategies for individual

clients. The group initially called itself the "VIPER Group" (an acronym for "Value Ideas Produce Extraordinary Results"), but changed its name to the "Strategic Individual Solutions Group," or "SISG," in or about early 2000 (the "VIPER/SISG group"). The tax strategies designed, marketed and implemented by the VIPER/SISG group included tax shelters that could be used by high-net-worth clients to eliminate, reduce or defer taxes on significant income or gains. The group's members worked together with financial institutions, law firms and other entities.

4. From in or about 1998 through at least in or about 2004, members of the VIPER/SISG practice at E&Y – conspirators not named as defendants herein – participated in a scheme to defraud the IRS by designing, marketing, implementing and defending tax shelters using means and methods intended to deceive the Internal Revenue Service ("IRS") about the bona fides of those shelters, and about the circumstances under which those shelters were marketed and sold to clients. By employing these tax shelters, wealthy individuals with tens or even hundreds of millions of dollars in taxable income could eliminate, reduce or defer the individual income taxes they would have to pay to the IRS, and instead pay a much smaller amount in fees to E&Y and the other entities and individuals that assisted in implementing the transactions. The fees were calculated largely as a percentage of the tax loss or tax deduction the client sought to generate.

5. The conspirators understood that if the IRS were to detect the clients' use of these tax shelters, and learn the true facts and circumstances surrounding the design, marketing and implementation of the shelters, the IRS would aggressively challenge the claimed tax benefits. In that event, the IRS would seek to collect the unpaid taxes plus interest, and might

also seek to impose substantial penalties upon the clients. Accordingly, although in reality the tax shelters marketed by E&Y were designed, marketed and implemented so as to generate tax losses that would be used by clients to reduce their tax liabilities, the conspirators falsely characterized these tax shelters as investments that had been entered into by the clients primarily or exclusively to generate profits and to accomplish other non-tax business objectives. The conspirators also took steps to hide various facts, including the fact that all the clients intended from the outset to complete a pre-planned series of steps designed to lead to the specific tax benefits, and the fact that the fees charged for the shelters were calculated as a percentage of the tax losses generated.

6. The law in effect at all times relevant to this Information provided that if a taxpayer claimed a tax benefit by using a tax shelter, and that benefit were later disallowed, the IRS could impose substantial penalties upon the taxpayer unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the tax benefit "more likely than not" would survive IRS challenge. In order to encourage clients to participate in the shelters, and to shield the clients from possible penalties, the members of E&Y's VIPER/SISG group identified law firms that would provide E&Y's clients with "more likely than not" legal opinions. However, these legal opinions were based upon false and fraudulent statements, and omitted material facts. By providing, and by assisting clients in obtaining, false and fraudulent opinion letters, with the understanding and intent that those opinion letters would be presented to the IRS if and when the clients were audited, the conspirators not only sought to undermine the ability of the IRS to ascertain the clients' tax liabilities, but also sought to undermine the ability of the IRS to determine whether penalties

should be imposed.

**The Fraudulent PICO Shelters**

7. Among the fraudulent tax shelters marketed to clients of E&Y was a shelter called "Personal Investment Corporation," or "PICO." During 2000 and 2001, E&Y sold and assisted in implementing approximately 96 PICO transactions for approximately 150 wealthy individuals.

8. The PICO shelters were implemented by Company Z. Company Z described itself as an investment advisory firm, but was actually involved primarily in developing and implementing tax shelters for wealthy individuals in exchange for substantial fees.

9. E&Y clients who implemented a PICO tax shelter during 2000, and many of the clients who implemented PICO during 2001, were offered a "more likely than not" legal opinion from a well-known law firm with offices around the United States and abroad ("the Law Firm"). The fees for those letters typically ranged between $50,000 and $100,000, depending on the size of the client's PICO transaction.

10. Defendant PETER CINQUEGRANI was an attorney employed by the Law Firm from 1986 through 1993, and again from 1997 through in or about April 2007. CINQUEGRANI, who was employed as an attorney with the IRS in the interim, returned to the Law Firm as a special counsel in 1997, and became a partner in January 2002. CINQUEGRANI was primarily responsible for drafting the legal opinions issued by the Law Firm to E&Y's PICO clients.

11. PICO was developed during 2000 by the principals of Company Z, working together with defendant PETER CINQUEGRANI and other attorneys at the Law Firm,

as well as members of E&Y's VIPER/SISG group. The objective of PICO was to defer the client's tax liability and, in some cases, to convert ordinary income into capital gains, thereby reducing the client's tax rate. Within a period of a few months, a PICO client would follow a pre-planned series of steps, and generate artificial losses that would be used to defer taxes indefinitely on any amount of income the client wanted to shelter.

12. PICO included the following essential steps:

a) A client seeking to defer tax liability would form an S-Corporation (the "PICO entity"), together with one or two individuals affiliated with Company Z. The client was a 20% shareholder in the PICO entity, and the other individuals were 80% shareholders ("the Company Z shareholders" or the "majority shareholders"). The client funded the S-Corporation with an amount equal to approximately 4% of the tax loss the client wanted to generate (in other words, 4% of the income the client wished to shelter from taxes).

b) Company Z would then use those funds to engage in trading activity, entering into financial instruments commonly known as "straddles." The "straddles" were designed to generate essentially off-setting gains and losses, which could be realized for tax purposes, or "triggered," separately. By pre-arrangement, the trading would be carried out for approximately 60-90 days, and then the straddle gains would be triggered. When that occurred, 80% of the gains would be allocated to the Company Z shareholders for tax purposes, and only 20% of the gains would be allocated to the client.

c) By further pre-arrangement, the client would next buy out or "redeem" the Company Z shareholders from the PICO entity. At that point, the client would be the 100% shareholder. Once the client was the 100% shareholder, the straddle losses would be

triggered, and 100% of the losses (an amount roughly equivalent to the amount of income the client was seeking to shelter) would be allocated to the client for tax purposes. These losses were artificial losses, in that there were no corresponding economic losses suffered by the client.

d) In order for the client to claim the full benefit of the losses generated in this fashion, the client would then increase its tax basis in the PICO entity by contributing additional assets to the entity. This could be done by taking existing assets held by the client in a bank account or brokerage account, and simply changing the name on the account to the name of the PICO entity. As long as the additional assets remained in the PICO entity's name, the tax liability on the client's income would be deferred. When assets were removed from the PICO entity, the value of those assets would be taxed at the capital gains rate.

13. As defendant PETER CINQUEGRANI and his co-conspirators knew, the PICO strategy would not survive legal scrutiny unless it had a non-tax business purpose. With knowledge that the true motivation behind the strategy was for the clients to obtain tax benefits, CINQUEGRANI and his co-conspirators developed a false cover story to explain to the IRS – if the client were ever audited – why the client had created an S-Corporation together with the Company Z shareholders, only to redeem those shareholders after 60 to 90 days. According to the cover story, the client formed an S-Corporation because the client wanted to use that entity as the client's principal investment vehicle, and because the client wanted to achieve asset protection and estate planning objectives. According to the cover story, the client included the Company Z shareholders in the S-Corporation in order to "try out" Company Z's trading strategy, and intended to decide after an initial trial period of 60 or 90 days – based on trading performance – whether to continue with that strategy. According to the story, if the client was

satisfied with the trading strategy, the client would redeem the other shareholders, and then enter into a two-year "currency consulting" agreement and an asset management agreement with one of Company Z's affiliate companies in order to continue to enjoy the benefits of Company Z's special trading expertise.

14. In order to persuade the IRS that the tax benefits achieved through the PICO strategy were allowable, and to avoid the imposition of penalties on clients if the IRS were to disallow the claimed benefits, defendant PETER CINQUEGRANI incorporated the false cover story described above into the legal opinions provided to the PICO clients by the Law Firm. CINQUEGRANI and his co-conspirators knew the opinion letters contained false and fraudulent statements and omitted material facts, including but not limited to the following:

a) The opinion letters stated that the PICO S-Corporations were not formed to avoid or evade federal income taxes, but were instead designed to facilitate investment activities, provide asset protection and achieve estate planning objectives. In reality, as the conspirators well knew, the S-Corporations were formed precisely so that clients could avoid or evade taxes.

b) The opinion letters stated that the Company Z shareholders became investors in the various PICOs in order to demonstrate the potential return available through interest rate arbitrage trading activity, when in reality, the Company Z shareholders were included in the transaction in order to accomplish the desired tax results.

c) The opinion letters stated that the trading strategy was not designed to produce a predetermined result, when in reality, E&Y had marketed to its clients, and the clients had paid fees to E&Y and Company Z to obtain, a strategy consisting of a pre-planned

series of steps leading to a predetermined tax benefit.

d) The opinions issued by the Law Firm failed to disclose that they were rendered by an attorney who had assisted the VIPER/SISG members and the principals of Company Z in designing and implementing the transaction, and had been offered to the clients as part of the marketing of PICO, and therefore were not independent.

15. In addition to developing the false cover story and including that version of facts in the PICO legal opinions, defendant PETER CINQUEGRANI and his co-conspirators took other steps to conceal from the IRS the fact that PICO was primarily, if not exclusively, tax-motivated; that it was designed, marketed and implemented as a pre-planned series of steps; and that the fees charged to each client were generally calculated as a percentage of the loss amount to be generated for that client. Among other things:

a) Although E&Y's fee for the PICO transaction was calculated as approximately 2% of the tax loss the client wished to generate, E&Y's engagement letter with each client reflected a fee of only $50,000. Defendant PETER CINQUEGRANI and his co-conspirators arranged for the balance of E&Y's fee to be paid by the client to an affiliate of Company Z, and for Company Z's affiliate then to pay the remainder of E&Y's fee to E&Y. In order to justify large payments from Company Z's affiliate to E&Y, CINQUEGRANI drafted, and his co-conspirators later signed, phony contracts under which E&Y claimed to have performed consulting services for the Company Z affiliate. The "consulting contracts" were created and signed well after most of the clients' PICO fees had been passed through the Company Z affiliate to E&Y, and were back-dated in order to make the discrepancy less obvious.

b) With an understanding that upon any audit the IRS would likely

request marketing materials that had been provided to the PICO clients, defendant PETER CINQUEGRANI and his co-conspirators agreed that Company Z would provide the PICO clients – including clients who had already completed PICO transactions – with written materials describing its "investment program."

c) In connection with the IRS's 2002 "voluntary disclosure initiative" – under which the IRS allowed individuals who had used tax shelters to avoid the imposition of penalties by voluntarily reporting the use of such shelters and by providing the IRS with a "description of all material facts" relating to those shelters under penalties of perjury – members of the VIPER/SISG group prepared a template submission to be submitted by E&Y clients who wished to report their PICO transactions to the IRS. The conspirators included in that template the false cover story described in paragraph 14 above. The false cover story was thereafter submitted to the IRS by numerous PICO clients, who attested to its accuracy under penalties of perjury.

d) The conspirators assisted PICO clients in responding to Information Document Requests ("IDRs") sent by the IRS to PICO clients by submitting false and fraudulent documents and information to the IRS concerning PICO. The IDR responses – which were drafted by individuals at E&Y on behalf of the clients – reiterated and elaborated upon the false cover story described in paragraph 14 above. The IDR responses also falsely stated that the legal opinions issued by the Law Firm contained all the materials facts concerning the PICO shelters, and falsely indicated that the clients had paid E&Y only $50,000 in fees.

e) In connection with an IRS promoter penalty audit of the Law Firm, defendant PETER CINQUEGRANI falsely testified, among other things, that the Law

Firm had no understanding with E&Y that potential PICO clients would be advised of the availability of a legal opinion from the Law Firm; that the PICO entity was designed as an estate planning vehicle; that the amount of the Law Firm's fee was based in part on the uniqueness of the analysis done for the client and was not based on the size of the loss to be generated for the PICO client; and that the "consulting" contract between E&Y and the Company Z affiliate related to services provided in connection with the PICO transactions.

**Statutory Allegations**

16. From in or about early 1998 through in or about 2006, in the Southern District of New York and elsewhere, PETER CINQUEGRANI, the defendant, together with others known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Section 7201; Title 26, United States Code, Section 7206(2); and Title 18, United States Code, Section 1001.

17. It was a part and an object of the conspiracy that PETER CINQUEGRANI, the defendant, and his co-conspirators, unlawfully, wilfully and knowingly would and did defraud the United States and the IRS by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

18. It was a part and an object of the conspiracy that PETER CINQUEGRANI, the defendant, and his co-conspirators, unlawfully, wilfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by

E&Y's PICO clients, in violation of Title 26, United States Code, Section 7201.

19. It was a further part and an object of the conspiracy that PETER CINQUEGRANI, the defendant, and his co-conspirators, unlawfully, wilfully and knowingly would and did aid and assist in, procure, counsel and advise the preparation and presentation under, and in connection with matters arising under, the internal revenue laws, of documents which were fraudulent and false as to material matters, in violation of Title 26, United States Code, Section 7206(2).

20. It was a further part and an object of the conspiracy that PETER CINQUEGRANI, the defendant, and his co-conspirators, unlawfully, wilfully and knowingly would and did make materially false, fictitious, and fraudulent statements and representations in matters within the jurisdiction of the executive branch of the Government of the United States, to wit, the IRS, in violation of Title 18, United States Code, Section 1001.

**Means and Methods of the Conspiracy**

21. Among the means and methods by which defendant PETER CINQUEGRANI and his co-conspirators would and did carry out the objectives of the conspiracy were the following:

a) They would and did design, market and implement tax shelter transactions, and create false and fraudulent factual scenarios to support those transactions, so that wealthy individuals could pay a percentage of their income in fees to E&Y, to Company Z and its affiliates, to the Law Firm, and to the other participants in the transactions, rather than paying taxes on that income to the IRS;

b) They would and did design, market and implement tax shelter

transactions in ways that disguised the fact that the shelters were largely or exclusively tax-motivated, and lacked substantial non-tax business purposes;

c) They would and did seek to prevent the IRS from learning that they had marketed and implemented tax shelters consisting of pre-planned steps leading to pre-determined tax benefits;

d) They would and did prepare and assist in preparing false and fraudulent documents to deceive the IRS, including but not limited to, engagement letters, transactional documents, representation letters, opinion letters, and correspondence with the IRS;

e) They would and did make false and misleading statements, including statements under oath, in connection with efforts by the IRS to ascertain the circumstances surrounding the design, marketing and implementation of tax shelters.

**Overt Acts**

22. In furtherance of the conspiracy and to effect the illegal objects thereof, PETER CINQUEGRANI, the defendant, and his co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a) On or about December 21, 1999, a co-conspirator sent an email to defendant PETER CINQUEGRANI, describing a version of the PICO transaction, characterizing it as "an S Corporation Capital Loss Generator," and asking CINQUEGRANI whether it would work and how much audit risk it entailed.

b) During 2000, defendant PETER CINQUEGRANI discussed with a co-conspirator how the PICO transaction could be structured in a manner that would disguise the full amount of E&Y's fee from the IRS.

c) In or about late 2000, in an effort to help disguise the size of the fee E&Y was charging its PICO clients, defendant PETER CINQUEGRANI drafted a phony consulting agreement to be executed by E&Y and an affiliate of Company Z.

d) In or about mid-2001, a co-conspirator signed a phony consulting agreement between E&Y and an affiliate of Company Z.

e) On or about June 7, 2001, a co-conspirator sent an email to PFC personnel throughout the United States, stating, "PICO slides are not to be left with clients, and this is a policy we must all adhere to. This is ultimately for the client's protection."

f) On or about March 25, 2001, a co-conspirator opposed a proposal by one PFC professional to provide clients with a work plan that laid out the steps of the transaction, stating, "[A]fter we go to the trouble to make sure the client does not have any documents that walk through the steps of the transaction, I cannot imagine that we would want to hand him a work plan that shows each minute step including the redemption of the S shareholder. I would strongly advise against providing a written document to the client that lays out these steps as a prearranged plan."

g) In or about early 2002, defendant PETER CINQUEGRANI sent to PICO clients a representation letter for them to sign, which falsely stated that the clients had not invested in their PICO entities primarily to obtain income tax benefits.

h) In or about early 2002, defendant PETER CINQUEGRANI sent to PICO clients legal opinions which falsely stated, among other things, that the Company Z shareholders had joined the clients' PICO entities in order to demonstrate Company Z's potential investment returns, that the PICO entities had not structured their transactions to achieve a

particular tax result, and that the PICO entities' decision as to the timing of the termination of the straddles was not based primarily on tax benefits.

i) On or about September 9, 2003, in a sworn statement taken by the IRS, defendant PETER CINQUEGRANI testified falsely.

(Title 18, United States Code, Section 371).

**COUNT TWO**

**(Tax Evasion)**

The United States Attorney further charges:

23. The allegations set forth in paragraphs 1 through 15 and 21 are repeated and realleged as if fully set forth herein.

24. Among the clients who implemented a PICO tax shelter in 2001 was Client A. Client A was offered the opportunity to participate in PICO by a representative of E&Y. On or about July 13, 2001, Client A executed an engagement letter with E&Y which falsely indicated that E&Y's fee for providing tax advisory services in relation to the PICO transaction would be $50,000.

25. Client A's PICO transaction was thereafter implemented by Company Z and the Law Firm. By following the pre-determined steps of the PICO transaction, Client A generated artificial losses of approximately $350 million during the tax year 2001. When Client A filed a U.S. Individual Income Tax return, Form 1040, for 2001, he used those artificial losses to offset his income, and thus eliminated many millions of dollars in income tax liabilities.

26. In or about early 2002, defendant PETER CINQUEGRANI drafted and sent

to Client A a representation letter to sign, which was intended to form the basis for Client A's legal opinion. The representation letter falsely stated that Client A had not invested in his PICO entity primarily to obtain income tax benefits. At the same time, CINQUEGRANI forwarded to Client A a draft legal opinion, which CINQUEGRANI intended for Client A to use, if audited, to support the tax benefits realized through the PICO transaction, and to protect Client A against IRS penalties if the claimed benefits were disallowed. CINQUEGRANI intentionally included false statements in the draft PICO opinion, and omitted facts he knew to be material, because he believed that the IRS and any reviewing court would disallow Client A's claimed tax benefits if the true facts and circumstances surrounding the transaction were known.

27. On or about April 18, 2002, in connection with the IRS's voluntary disclosure initiative, Client A signed under penalties of perjury, and submitted to the IRS, a disclosure letter that had been drafted by E&Y. That letter, which purported to provide the IRS with all material facts relating to Client A's PICO transaction, falsely described Client A's reasons for participating in the transaction, and omitted material facts.

28. In or about 2003 and 2004, in response to IDRs addressed to Client A and his PICO entity, representatives of E&Y submitted to the IRS false and misleading statements concerning, among other things, Client A's reasons for participating in the PICO transaction, the reason why the Company Z shareholders had initially become shareholders of Client A's PICO entity, and the nature of the fees paid in connection with Client A's PICO transaction. The IDR responses, which purported to include "all material facts" concerning the transaction, also omitted numerous material facts.

**Statutory Allegations**

29. From on or about January 1, 2001, through at least in or about 2004, in the Southern District of New York and elsewhere, PETER CINQUEGRANI, the defendant, unlawfully, wilfully and knowingly did aid, abet, counsel, induce and procure an attempt to evade and defeat a substantial part of the income tax due and owing by Client A to the United States of America for calendar year 2001.

(Title 26, United States Code, Section 7201 and
Title 18, United States Code, Section 2)

**COUNT THREE**

**(Aiding and Abetting the Filing of False Documents )**

The United States Attorney further charges:

30. The allegations set forth in paragraphs 1 through 15 and 21 are repeated and realleged as if fully set forth herein.

31. From on or about January 1, 2000, through at least in or about 2004, in the Southern District of New York and elsewhere, PETER CINQUEGRANI, the defendant, unlawfully, wilfully and knowingly would and did aid and assist in, procure, counsel and advise the preparation and presentation under, and in connection with matters arising under, the internal revenue laws, of documents which were fraudulent and false as to material matters, and which were submitted to the IRS, to wit, legal opinions and other documents that falsely described the

reasons why individuals participated in PICO transactions and falsely understated E&Y's fees for the PICO transactions.

(Title 26, United States Code, Section 7206(2)).

MICHAEL J. GARCIA
United States Attorney